Kottmyer, J.

INTRODUCTION

Plaintiffs, C. David Larson and Nicolette Larson (“the Larsons” or “Plaintiffs”), filed this appeal, pursuant to G.L.c. 40A, § 17, from a decision of the Topsfield Zoning Board of Appeals (“the Board”) granting a comprehensive permit to defendant Boston Street Topsfield Builders, LLC (“Boston Street”) pursuant to G.L c. 40B, §21. Plaintiffs’ land abuts the land on which Boston Street proposes to build housing if the permit is upheld.
The Court bifurcated the trial and heard all evidence on the issue whether Boston Street satisfied the jurisdictional requirements for issuance of a comprehensive permit. Based on the evidence presented at the trial, I find that the preliminary approval Boston Street had obtained for funding through the Federal Home Loan Bank’s New England Fund was withdrawn in August 2002. Further, because Boston Street never satisfied the jurisdictional requirements for issuance of a comprehensive permit, the permit must be annulled and a remand to the Board is not appropriate.

FINDINGS OF FACT

1. Boston Street is a limited liability company. Its Operating Agreement (Ex. 38, ¶2.03) provides: “It is expressly agreed that this LLC shall be deemed a ‘Limited Dividend Organization’ ‘as defined by MGL c. 40B.”[1] The Operating Agreement may be amended at any time. It contains no limitation on profits. Boston Street’s Certificate of Organization (Ex. 33) describes the “general character of its business” as “the purchase, management, development and subsequent sale of real estate.” Boston Street is the sole beneficiary of the Boston Street Realty Trust which holds record title to property at 470 Boston Street, Topsfield, Ma. (“the Site”). Douglas Conn (“Conn”) is the Manager of Boston Street and Trustee of the Trust.
2. Boston Street filed an application for a comprehensive permit with the Board on June 6, 2000. The application proposes construction at the Site of “52 units of ‘over 55’ housing of which 13 shall be affordable and 39 shall be market” (the “Boston Street Project”).[2] The attachments to the application include a pro forma financial statement that indicates an “Allowable Profit” of 20% , as well as a “Marketing of Affordable Elder Housing and Lottery Plan.”[3] Also attached to the application is a copy of a so-called “eligibility” or “site approval” letter dated June 2,2000, on letterhead of WarrenBank (the “Bank”) (Ex. 34). The letter is addressed to Conn. It bears the signature of Mark Terry, Senior Vice President, and was drafted by Kevin Dean, a Vice President. Dean and Terry were commercial loan officers for the Bank. The letter states:
*686 After our review of plans for your development at 470 Boston Street, Topsfield, MA, it is the opinion of WarrenBank that the project is eligible for a Comprehensive Permit. WarrenBank will provide financing for the construction of the affordable units through the Federal Home Loan Bank New England Fund, which is a federally subsidized fund. Please contact me with any questions you may have.
3. Neither Boston Street nor Conn submitted a written application for financing to WarrenBank. In particular, no application for a loan had been filed before the June 2, 2000 letter issued. Terry was familiar with projects developed by Conn in the past in the geographic area served by the Bank, including an affordable housing project in Boxford. WarrenBank had financed several construction projects developed by Conn and a partner in the 1990s and the relationship had been successful. Before the eligibility letter issued, Boston Street submitted “a site plan, a rough pro forma and rough sketches of architecturals” to the Bank. Bank officials did not visit the Site before issuing the letter, but did visit the site before June 15, 2000.
4. On June 15, 2000, Steven Pettengill, a loan officer, wrote to Conn asking him to furnish tax returns and a personal financial statement. (Ex. 20.) The letter asked Conn to include his request for the desired financing as it was “unclear” whether Boston Street was interested in construction financing on the affordable component only or the overall project.
5. Consistent with the then practice of the Federal Home Loan Bank (“FHLB”) relating to the issuance of eligibility letters for comprehensive permits by its member banks, WarrenBank did not apply for and did not receive approval from either the FHLB or the New England Fund (NEF) for the Boston Street Project before issuing the eligibility letter.
6. Terry prepared a memorandum recommending approval of the loan for WarrenBank’s loan committee on January 2, 2001. The loan was approved on January 17, 2001. (Ex. 40.)
7. The Federal Home Loan Bank of Boston (FHLB) receives no federal funding. FHLB is a for-profit entity that is wholly-owned by its member banks.
8. NEF is not described in any statute or federal regulation. NEF does not require that the developer’s profits be limited or that affordability of units be maintained in the long term. NEF does not monitor long-term compliance with comprehensive permit requirements.
Neither FHLB nor NEF reviews applications for suitability or eligibility under G.L.c. 40B and neither reviewed Boston Street’s application.
9. The Board conducted hearings on the application. The Board voted to approve Boston Street’s application for a comprehensive permit on January 16, 2001. The oral motion of the Board to approve Boston Street’s application was to approve the application subject to certain specified conditions, including the condition that the approval “was subject to Boston Street complying with the eligibility requirements of 760 CMR 31.01.” The Decision lists a number of conditions, but does not include the condition that the approval is subject to Boston Street’s satisfaction of the eligibility requirements of 760 CMR31.01. (Ex. 8.) Specifically, it does not impose a limitation on profits and does not require any regulatory agreement or any other mechanism to establish and enforce any limitation on Boston Street’s profits.[4] The Decision fails to specify what constitutes an “affordable” unit, fails to require that any specific number of units in the project be affordable and fails to specify the period of time for which affordability must be maintained. The Decision does not require a deed rider, oversight agreement or any other mechanism to maintain affordability. Boston Street was and remains willing to sign a regulatory agreement in the form of Ex. 41 and a deed rider in the form that is Ex. 42. Both exhibits are forms which have not been completed. Neither was reviewed by WarrenBank or the FHLB in connection with the Boston Street Project and neither was submitted to the Board. There is no reference (general or specific) to either document in the Final Decision.
10. Counsel for the Board prepared a “corrected decision” that included a condition requiring Boston Street “to comply with 760 CMR 31.01 by remaining a limited dividend partnership” until “the Applicant no longer has an interest in the project or until substantially all of the Units are sold.” (Ex. 9.) The “corrected decision” was never signed and was not filed in the Town Clerk’s office.
11. In August of 2002, FHLB suspended the NEF when the Massachusetts Department of Housing and Community Development (DHCD) proposed a regulation that required FHLB to provide a written determination of eligibility (a project-eligibility or site approval letter) for any 40B development to be funded using NEF. (Ex. 36.) Before August 2002, FHLB sent letters to its member banks concerning the status of NEF projects “in the pipeline” as of that date. To preserve eligibility for funding of a particular project under the NEF, the member bank was required to send documentation to FHLB by August 2002, and receive back from FHLB a letter approving the application. Warren-Bank did not apply for such approval for the Boston Street Project and FHLB did not approve any such application.
12. On December 16, 2003, Boston Street filed an “Emergency Motion/Affidavit to Continue Trial.” (Ex. 39.) The Motion states that NEF had been discontinued because the Commonwealth of Massachusetts then required NEF to issue site approval letters pursuant to state guidelines. The Motion further represented that existing projects for which site eligibility *687 letters had been issued would be “grandfathered” in the event that the member bank that issued the site eligibility letters had timely filed the appropriate documentation, but that the WarrenBank had not filed such documentation in connection with the Boston Street Project.
13. Boston Street received a letter from the Massachusetts Housing Finance Agency (the “MHFA’j on January 14, 2003 (Ex. 35). The letter states that the MHFA is “interested in considering” Boston Street’s request for construction under the Housing Starts program.

APPLICABLE LAW

1. General Laws c. 40B, §§20-23 (the Act), and the regulations adopted thereunder, 760 Code Mass.Regs. §§30.02 et seq. (1993), were enacted and promulgated to provide relief from exclusive zoning practices which prevented construction of badly needed low and moderate income housing. Board of Appeals of Hanover v. Housing Appeals Comm., 363 Mass. 339, 353-54 (1973).
2. The Act permits limited dividend or nonprofit organizations proposing to build low or moderate income housing to submit a single application to the board of appeals of a city or town instead of separate applications with each local agency or official having jurisdiction over various aspects of the proposal. G.L.c. 40B, §21; Zoning Bd. of Appeals of Wellesley v. Housing Appeals Comm., 385 Mass. 651, 656 (1982); Board of Appeals of Hanover v. Housing Appeals Comm., supra, 363 Mass. at 345. The board of appeals may grant a single comprehensive permit for construction after considering the recommendations of the local agencies and officials. Id.
3. As of June 6, 2000, the regulation governing jurisdictional requirements, section 760 CMR 31.01(1), required the applicant and the project to fulfill the following requirements to be eligible to submit an application for a comprehensive permit or to file or maintain an appeal before the Housing Appeals Committee: (a) The applicant was required to be a public agency, a non-profit organization, or a limited dividend organization; (b) The project was required to be fundable by a subsidizing agency under a low and moderate income housing program; and (c) the applicant was required to control the site. The regulation further provides that a project shall be presumed fundable if a subsidizing agency makes a written determination of Project Eligibility or Site Approval. Thereafter, the project shall be considered fundable unless there is sufficient evidence to determine that the project is no longer eligible for a subsidy. Subsection 4 provides that a determination of Project Eligibility or Site Approval shall be for a particular financing program. A change in the program under which the applicant plans to receive financing shall require a new determination, and may be deemed a substantial change pursuant to 760 CMR 31.03.
4. The Act defines low or moderate income housing as “any housing subsidized by the federal or state government under any program to assist the construction of low or moderate income housing as defined in the applicable federal or state statute, whether built or operated by any public agency or any nonprofit or limited dividend organization.” G.L.c. 40B, §20.
5. The Act does not define the term “Limited Dividend Organization.” 760 CMR 30.02 defines “Limited Dividend Organization” as “any applicant which proposes to sponsor housing under M.G.L.c. 40B; and is not a public agency; and is eligible to receive a subsidy from a state or federal agency after a comprehensive permit has been issued and which, unless otherwise governed by a federal act or regulation, agrees to limit the dividend on the invested equity to no more than that allowed by the applicable statute or regulations governing the pertinent housing program.”
6. Boston Street, as the recipient of the permit, has the burden of proving that, at the time the application was filed, it was a limited-dividend organization; it controlled the site of the proposed development; and the proposed project was eligible for funding from a subsidizing agency.[5] See 760 CMR 31.01(1); Tebo v. Board of Appeals of Shrewsbury, 22 Mass.App.Ct. 618, 626 (1986).[6]
7. Section 31.01(2) was amended effective August 31,2001. (Ex4.)[7]As amended, the regulation provides that “fundability” is established by submission of a “written determination of Project Eligibility (Site Approval)” that includes specified information, including “relevant details of the particular project if not mandated by the housing program (including percentage of units for low and moderate income households, income eligibility standards, the duration of restrictions requiring low or moderate income housing, and the limited dividend status of the developer)”, and makes specified findings, including findings that the proposed project appears generally eligible under the requirements of the housing program and that the developer meets the general eligibility standards of the housing program.
8. A December 20, 2002 amendment to 760 CMR 31.01(2), applicable to all applications for comprehensive permits that receive determinations of Project Eligibility after July 22, 2002, addresses programs like the NEF by adding a new subsection (g) that states:
If project funding is provided through a non-gov-emmental entity, a public or quasi-public entity authorized by the Department shall make the determination of Project Eligibility (Site Approval). The designated entity that issued the Project Eligibility (Site Approval) determination shall administer the project thereafter as specified in program guidelines issued by the Department.
9. The Commissioner of the Department of Community Affairs is authorized to interpret the provisions of *688 G.L.c. 40B, §§20-23 in the first instance and to promulgate rules and regulations.
10. G.L.c. 23B, §5A provides that there shall be a Housing Appeals Committee that shall hear appeals pursuant to G.L.c. 40B, §22 (“the Committee”).. If a local zoning board denies an application for a comprehensive permit or approves an application but imposes conditions that make the project “uneconomic,” the applicant may appeal to the Committee. G.L.c. 40B, §§22, 23. Pursuant to G.L.c. 40B, §22, the Committee conducts a de novo review to determine whether a local zoning board’s decision is “reasonable and consistent with local needs.” G.L.c. 40B, §23. See Board of Appeals of Hanover v. Housing Appeals Comm., supra 363 Mass. at 371.
11. A person aggrieved by the decision of the local zoning board granting a comprehensive permit may appeal to the Superior Court pursuant to G.L.c. 40A, §17.

DISCUSSION

A. The Suspension of Boston Street’s Funding
In August 2002, the NEF was suspended and WarrenBank’s approval of the Boston Street Project for NEF funding terminated when no request for approval of the Boston Street Project was submitted to the FHLB by the WarrenBank. Boston Street thereafter obtained a letter dated January 14, 2003, from the MHFA stating that it was “interested in considering” Boston Street’s request for funding. The MHFA letter does not constitute a project eligibility letter. See Hastings Village, Inc., No. 95-05 at 22-23, detailing the assurances contained in an MHFA project eligibility letter. If the comprehensive permit was valid and funding was suspended while the appeal was pending in the Superior Court, the Court would ordinarily remand the matter to the Board so that the applicant would have an opportunity to secure alternate funding and the Board could make the necessary determinations with respect to substitute funding. See 760 CMR §§31.01 (4) and 31.03. Because, however, the record establishes that Boston Street never satisfied the jurisdictional requirements for issuance of a permit, remand is not appropriate.
B. Satisfaction of Jurisdictional Requirements
1. Limited-Dividend Organization
Chapter 40B, Section 20 “limits the class of proper applicants [for comprehensive permits] to public agencies, nonprofit organizations, and limited dividend organizations.” Board of Appeals of Hanover, supra, 363 Mass. at 345, n.6. The term “limited-dividend organization” is not defined in G.L.c. 40B. The regulations define the term by reference to the requirements of a specified housing program of a subsidizing agency. A limited dividend organization is a legal entity that agrees to “limit the dividend on the invested equity to no more than that allowed by the applicable statute or regulations governing the pertinent housing program.” 760 C.M.R. 30.02 (emphasis added). See Stuborn Ltd. Partnership v. Barnstable Board of Appeals, Housing Appeals Committee No. 98-01, *17 (1999).
Relying on Committee decisions, including Stuborn Ltd. Partnership, and the opinion of the Supreme Judicial Court in Board of Appeals of Hanover v. Housing Appeals Committee in the Department of Community Affairs, 363 Mass. 339, 420-21 (1973), Boston Street and the Board argue that the determination whether a party is a limited-dividend organization is best left to the funding agency and its status as such need only be established before construction actually begins. In Hanover, the Court reasoned that since 1) eligibility turns on the ability to qualify for the appropriate funding; 2) to qualify an applicant must propose to build “low or moderate income housing”; and 3) the phrase is defined in terms of standards set by the selected subsidizing agency, “the question of standards for eligibility as a limited dividend organization is properly left to the appropriate State or Federal funding agency.” Id. at 379. The Court emphasized, however, that its holding did not prevent the board or committee “from requiring full disclosure of the organization’s legal status and further requiring compliance with pertinent statutory and regulatory requirements.” Id.[8]
The Court’s reasoning in Hanover has no application to this case. The NEF, the “pertinent housing program,” does not impose a limitation on profits; it sets no standards for eligibility as a limited-dividend organization. Accordingly, eligibility under that program, by itself, does not establish an applicant’s status as a limited-dividend organization and does not provide any assurance that the limitation on profits will be enforced for any period of time. In Hastings Village Inc. v. Wellesley Zoning Board of Appeals, Housing Appeals Committee No. 95-05, the Committee discussed the failure of the NEF program to limit dividends. In Hastings, the developer had voluntarily agreed to limit dividends to 10%. The Committee stated:
The limitation of dividends is one of a number of requirements which must be overseen by the subsidizing agency. Typically, this is ensured by the regulatory agreement between the developer and the agency. If this were a program where all projects were required to meet consistent standards published in guidelines or regulations, and there were foolproof mechanisms (such as deed riders and loan documents supplied by the program) in place, a regulatory agreement might not be necessary . . . But here, .. . there must be a regulatory agreement to memorialize the structure of the project.
Id. at *29-31. The Committee stated that the developer’s offer to enter into an agreement was not sufficient; on the contrary, an acceptable regulatory agreement must be prepared before proceeding with the comprehensive permit. Id.
*689 The limitation on profits is a statutoiy requirement. Boston Street’s Operating Agreement states only that the entity shall be “deemed” a limited-dividend organization; it imposes no limitations on profits. The NEF, the pertinent housing program, does not impose a limitation on profits and no regulatory agreement was reviewed or approved in connection with WarrenBank’s issuance of the eligibility letter. No limitation on profits was made a condition of or otherwise addressed in the Final Decision or the permit.[9] In these circumstances, the fact that Boston Street submitted pro forma financial statements indicating a profit of 20% and stated its willingness to enter into agreements limiting profits is insufficient to satisfy the jurisdictional predicate that the applicant be a limited-dividend organization.
2. Fundability
To find the Boston Street Project fundable, the Court must be satisfied that a subsidizing agency made a determination of eligibility or site approval. A fundable project is one that is generally eligible pursuant to the requirements of the specified housing program or appears financially feasible. Matthew A. Welch v. Easton Board of Appeals, Housing Appeals Committee No. 94-06, *1 (1995). Before applying for a comprehensive permit, a proposal must be submitted to a subsidizing agency for preliminary approval; it is presumed to be fundable if the subsidizing agency makes a written statement of project eligibility. 760 CMR 31.01(2). This presumption, however, may be rebutted by contrary evidence. Stoneham Heights Ltd. Partnership v. Zoning Board of Appeals of the Town of Stoneham, Housing Appeals Committee, No. 87-04, *18 (1991) (site approval letter does not conclusively establish jurisdiction).
The Committee has suggested that the substance of the fundability requirement is more important than the form. Woodridge Realty Trust, Housing Appeals Committee, No. 00-04 at *8 (2000).[10] The letter need not be the only evidence the Committee considers in determining whether the jurisdictional element has been satisfied, and the reviewing body may consider in-court testimony, the funding agency’s familiarity with site, and the history of the local housing market, in reaching its final decision to issue a permit. Id.
The defendants argue that the eligibility letter issued by the WarrenBank (Ex. 34), in combination with other evidence, is sufficient to satisfy the jurisdictional requirements for issuance of a comprehensive permit. This argument is foreclosed by the Committee’s decisions in Hastings Village, Inc., supra, and Stuborn Ltd. Partnership, supra, both of which predated Boston Street’s application for a comprehensive permit.[11] In a memorandum on a motion to dismiss in Hastings Village, Inc., the Committee ruled that for purposes of the Comprehensive Permit law, the FHLB’s NEF was a program of the federal government.[12] The Committee also addressed the sufficiency of the eligibility letter in that case. It noted that the NEF had not established affordability levels[13] or the required lock-in period.[14] It stated:
At a minimum, the developer must show that all mechanisms necessary to ensure that 25% of the units will be affordable for 15 years have actually been created and have been approved by the FHLB of Boston. Typically, such mechanisms would consist of affordable housing restrictions contained in a regulatory agreement between the developer and the FHLB of Boston.
Id. at *11. The Committee concluded that because, unlike certain other programs, the NEF had not published guidelines or regulations clearly indicating that the program standards satisfied Chapter 40B requirements, “a simple statement” in a letter from a member bank “that basic program requirements (25% affordability for people at 80% of median income, 15 year lock-in, and an annual dividend limitation of 10%) will be met” was insufficient to establish eligibility for a permit. Id. at *24. The Committee stated:
The Board is entitled to know that the necessary mechanisms have been developed and approved. Further, where there are no published regulations or guidelines, but only program documents, the Board (and the public, for that matter) should be given notice in the site eligibility letter of where such documentation is available for public scrutiny. We will not accept the Project Eligibility letter until it satisfies these requirements.
Id. at 25. The Committee concluded that the jurisdictional requirements of the comprehensive permit law had not been satisfied and, pursuant to §31.05, granted the developer sixty (60) days to remedy the failure.[15] Id. at *31.[16]
In Stuborn Ltd. Partnership, Housing Appeals Committee No. 98-01, the Committee again discussed the NEF. In that case it found that the eligibility letter was sufficient, but remanded for further proceedings before the Board. The Committee reiterated that, in addition to the applicant’s qualifications, a qualified housing program must address three fundamental criteria for comprehensive permit eligibility; they are: (1) income level of occupants; (2) proportion of housing that is affordable; and (3) duration of The affordability requirements. Stuborn Ltd. Partnership, Housing Appeals Committee No. 98-01 at *8-11. To qualify as a housing program pursuant to the regulations, the program need not specify each of the criteria in its guidelines. Id. at *11. A program can also meet the criteria by entering into agreements with developers. Id.
In compliance with comprehensive permit laws, the NEF now mandates that 25% of the owners or renters at a proposed unit have incomes that do not exceed 80% of the area median income. Id. The program, however, does not mandate the other two elements of *690 comprehensive permit eligibility: long-term compliance and profit limitation. In Stuborn, the Committee stated that because the FHLB and NEF fail to mandate two of the three eligibility requirements and, thereby, retain less control of program participants than a traditional housing program would, NEF projects place more of a burden on the town and lending institution to analyze design, program and financial issues, as well as long-term affordability issues. Id. at *19 and *27.
In Stuborn, the Committee ruled that the NEF was a qualified program based on the evidence, including the developer’s submission of deed riders and regulatory and monitoring agreements,[17] that provision had been made to guarantee long-term affordability, to limit profits and for long-term monitoring of compliance. Id. at *3 The Committee remanded the matter to the Board for a hearing on the merits with instructions, inter alia, that the Board carefully review the deed rider establishing affordability levels, and consider defining the profit limitation in more detail than it was defined in the regulatory agreement. The decision states that “programmatic details,” including “the minimum chapter 40B standards,” and also matters of more general public policy, must be finalized prior to the issuance of a comprehensive permit and then monitored for compliance throughout the lock-in period. Id. at *21. Such issues must also be addressed in the Board’s final decision. Id. at *24.
When Boston Street filed its application in this case, the Committee’s decisions in Stuborn Limited Partnership and Hastings Village, Inc. and the express guidance provided by the Committee in its decision in Hastings Village, Inc. as to mechanisms for compliance with jurisdictional requirements in cases in which the FHLB was the subsidizing agency and the NEF was the pertinent housing program were available. Yet, no attempt was made by Boston Street, WarrenBank or the Board either to address the “programmatic details” of the proposed project or to assure satisfaction of the jurisdictional requirements at the time of construction and for the long term. In this case, there is a complete failure to address the fundamental requirements of affordability, dividend limitation and long-term monitoring in both the WarrenBank letter and the Final Decision. The “eligibility letter” that was submitted to the Board contains less detail than the letter ruled insufficient in Hastings Village, Inc. Hastings Village, Inc., No. 95-05 at *24-26. Moreover, the comprehensive permit is not conditioned on compliance with these jurisdictional requirements. As a matter of law, Boston Street’s willingness to execute a Deed Rider and Regulatory Agreement in the form of Exhibits 41 and 42 is not an adequate substitute for analysis and review by the Board of the mechanics of compliance with the statutory requirements and does not abrogate the requirement that these issues be addressed before a comprehensive permit issues and in the Final Decision issuing the permit.

CONCLUSION AND ORDER FOR JUDGMENT

Because Boston Street’s financing under the NEF program has been suspended and because Boston Street never satisfied the jurisdictional requirements set forth in 760 C.M.R. 31.01(1) for issuance of a comprehensive permit, remand to the Board is inappropriate and the comprehensive permit issued to Boston Street by the Topsfield Board of Zoning Appeals on January 16, 2001 must be annulled. Judgment shall enter annulling the permit.

As set forth below, Chapter 40B does not define the term “limited dividend organization.” Regulations promulgated by the Department of Community Affairs pursuant to Chapter 40B, 760 CMR 30.02, define “Limited Dividend Organization" as “any applicant which proposes to sponsor housing under M.G.L.c. 40B; and is not a public agency; and is eligible to receive a subsidy from a state or federal agency after a comprehensive permit has been issued and which, unless otherwise governed by a federal act or regulation, agrees to limit the dividend on the invested equity to no more than that allowed by the applicable statute or regulations governing the pertinent housing program.”

For reasons which are unclear, the Decision describes the application as proposing “construction of 48 units of elderly, single-family housing.” (Ex. 8.)

Certain of the attachments to Ex. 23, e.g., a statement regarding compliance with Standards of the Topsfield Affordable Housing Committee for Site Layout and Construction of 40B Multi-Family Subdivisions, reference events that occurred after the application was submitted and thus could not have been attached to the application when it was submitted. The statement relating to standards states that a Pro Forma Financial Plan was submitted therewith, but the only pro forma in evidence is Ex. 16, a document that was sent by facsimile to an unknown recipient on January 8, 2001. Nonetheless, for purposes of this decision, I have treated those documents as part of the application.

The pro forma submitted to Warren Bank (and presumably the Board) shows an “Allowable Profit” of 20%. That figure was based on Conn’s experience with other programs.

Plaintiffs concede that defendant has control of the site.

The applicability of these requirements to the date on which the application is filed is clear given that subsection 5 of section 31.01 defining jurisdictional requirements provides that failure of the applicant to fulfill any of the requirements in subsection (1) may be raised by the Housing Appeals Committee, the Board, or a party at any time, and “shall be cause for dismissal of the application or appeal,” provided that the applicant has had at least sixty days to remedy the failure (emphasis added).

This amendment followed the decision of the Housing Appeals Committee in Woodridge Realty Trust v. Ipswich Board of Appeals, HAC No. 00-04.

In Hanover, the applicant’s articles of organization contained specific provisions relating to eligibility and a letter from the Massachusetts Housing Finance Agency stated that it considered the applicant to be a limited-dividend organization. In contrast to the NEF, the MHFA housing programs had established limits on profits. See Hastings Village, Inc. v. Wellesley Zoning Board of Appeals, Committee No. 95-05 at *22-24.

The corrected permit was never signed. Moreover, it contains no specifics as to any such limitation.

In Woodridge, the Committee found that an incomplete letter was sufficient to establish eligibility because: the bank was already familiar with the developer’s credentials and had financed projects with him in the past; the developer had *691 submitted plans, architectural drawings, an NEF regulatory agreement, and a sample project eligibility letter to the bank; the bank was familiar with the finances underlying the proposed development at the time it assessed preliminary eligibility; the bank knew the site from previous visits; and, the bank had conducted an evaluation of the “financial risks based on surrounding land uses, and [a] review of compliance with NEF requirements.” Id.

The Guidelines for Local Review of Comprehensive Permits issued by DCHD in October 1999 (Ex. 1) contain an express recommendation at pg. 9 that “[w]hen the ZBA receives an ... NEF application, it should familiarize itself with the Housing Appeals Committee’s decision in Stubom . . . which sets out new roles for the Board with respect to these projects.”

The Committee rejected the argument that the participation of a private member bank changed the nature of the enterprise. The Committee reasoned that where “in addition to normal banking industry underwriting procedures, programmatic aspects of the proposal are reviewed before funding is approved, conditions are imposed for the release of funds, and programmatic compliance is assured during and after construction by a regulatory agreement, ... [it is irrelevant whether the FHLB of Boston ensures that these protections are in place by dealing directly with the developer or through an intermediary.” Id. at *20.
In Planning Board of Hingham v. Hingham Campus, LLC, 438 Mass. 364 (2002), the Supreme Judicial Court, without discussion, described the NEF as an affordable housing financing program operated by the FHLB through its member institutions and made specific reference to the definition of low or moderate income housing in section 20 of chapter 40B. Id. at 367 and n.5.

The eligibility letter in Hastings Village, Inc. did state that affordability would be required. NEF subsequently adopted requirements for affordability.

The Committee had “read into” the definition of low and moderate income housing a requirement that the housing remain affordable for at least 15 years, the so-called “lock-in period.” In Zoning Board of Appeals of Wellesley v. Ardemore Apartments Ltd Partnership, 436 Mass. 811, (2002), the Supreme Judicial Court held that, where a comprehensive permit does not specify for how long housing units must remain below market, affordability must be maintained as long as the project is not in compliance with local zoning requirements. In that case, a 15-year lock-in period was not made a condition of the permit, but was required by the MHFA financing documents.

Section 31.05 applies to proceedings pending before the Board or Committee which, unlike the present case, by definition, involve situations in which a permit has not yet issued or a permit has issued with conditions unacceptable to the developer.

In that decision, the Committee set forth “as guidance for establishing fundability in conformity with this memorandum,” a list of suggested filings by a developer seeking to satisfy the jurisdictional requirements, including evidence of the exact nature of the public subsidy presumably in the form of documentation from the FHLB of Boston, evidence that the FHLB or member bank, or both, have approved, as to form, mechanisms, (which typically include an enforceable regulatory agreement) to ensure affordability requirements and the lock-in period and evidence that annual dividends will be limited by means of an enforceable regulatory agreement between the developer and the FHLB of Boston. These guidelines also specify that the project eligibility letter will state the programmatic details of the proposed project, if not clearly fixed by program regulations or guidelines (e.g., percentage affordable units, eligibility standards for owners, the lock-in period, and limitations on profit) and will specify the location at which legal documentation of the programmatic details is available for public review. Id. at *32-33.

These documents had been drafted in collaboration with the FHLB of Boston. Id. at *3-4.